IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

Gloria A. Green, Plaintiff,

v.

York County Library, Defendant.

C/A No. 0:09-1791-JFA-PJG

**REPORT AND RECOMMENDATION**

The plaintiff, Gloria A. Green ("Green"), filed this employment discrimination case pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") against her former employer, the York County Library ("the Library"). This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendant's motion for summary judgment. (ECF No. 31.) Having carefully considered the parties' submissions and the applicable law, the court finds that the defendant's motion should be granted.

**BACKGROUND**

Green is an African American woman and worked as a reference librarian at the Library from 1980 until she retired in 2007. She raises claims of race discrimination, hostile work environment based upon her race, and retaliation for engaging in protected activity under Title VII.

Green was hired in 1980 by David Lyon, the Director of the Library, who remained Director until his retirement in early March of 2007. Throughout much of her twenty-seven years with the Library, Green reported to Elizabeth Ellis, with whom she had an excellent relationship. Upon



PJG

Lyon's retirement, Colleen Carney[1] was hired as Director. Roughly contemporaneously with the commencement of Carney's employment as Director, Deb Salmond was hired to replace Elizabeth Ellis, who had been previously transferred to a branch library. As Manager of Reference Services, Salmond directly supervised the reference librarians.

Green's claims in this case center around her contention that during his tenure Lyon created or allowed a racially hostile work environment and that Carney and Salmond "continued Lyon's racist agenda" after Lyon's retirement. (See Green Dep. at 120, 136; ECF No. 31-6 at 30, 34.) She appears to base her theory of the case on several incidents from the early 1980s that she contends show that Lyon was racist. These include: (1) an occurrence when Lyon allegedly used, in front of Green, a racial epithet to refer to the boyfriend of Library employee Shasta Brewer; (2) an occurrence where Lyon allegedly stated that he did not want Green and another black librarian working on the same nights because the public might assume that they were not doing their jobs but rather "were doing NAACP business"; (3) a statement Green attributes to Brewer, who denies it, that Lyon admitted to Brewer that Lyon had a problem with African Americans because "that was the environment that he was raised in" but that he was trying to change; (4) the fact that Lyon hired a white employee, Page Hendrix, as Circulation Manager instead of advertising the position, an action about which Green complained; and (5) an incident where Green served on a grievance committee and was the only member to rule in favor of an African American employee regarding a promotion that Lyon had given instead to a Caucasian woman. Green also discusses an alleged incident in 1995

[1] Colleen Carney's legal name is now Colleen Kaphengst. (Corney Aff. ¶ 1, ECF No. 31-4 at 1.)





where Lyon permitted a white probationary employee to file a grievance against Green even though probationary employees did not have grievance rights.

Additionally, Green relies on two incidents involving Jan Jerauld, whom Green asserts was a member of Lyon's senior management team. Green alleges first that Jerauld immediately assumed that a patron who complained about a "little black girl" in the reference department was referring to Green even though other African American employees worked in that department. Second, she contends that Jerauld falsely accused Green of stealing coffee supplies from the Library and refused to take action when Green complained that other employees were stealing Green's food from the refrigerator. According to Green, Lyon ultimately addressed Green's complaints about Jerauld after Green consulted with and sent a copy of her written complaint to an attorney. These incidents involving Jerauld apparently occurred in the early 2000s.

More recently, Green alleges that in 2005 rumors began circulating that Gloria Zinky, who worked for a short time as Manager of Adult Services following Jerauld's retirement, planned to find a way to terminate Green as well as two other white employees, Ellis and Linda Fidelle, so that Green could not file a claim of race discrimination. Green complained to Lyon that Zinky was "executing his racist agenda." (Green Dep. at 61, ECF No. 31-6 at 16.) According to Green, Lyon then stated that he would get rid of Zinky; Zinky's probationary employment ended soon after. In 2006, Ellis was transferred to a branch library. (Andrews Aff. ¶ 10, ECF No. 31-2 at 3.) Fidelle was terminated in the fall of 2007 for performance reasons shortly before Green retired. (Carney Dep. at 29-30, ECF No. 31-7 at 8.)

Green continued to have issues at work after Carney took over as Director and Salmond replaced Ellis as Reference Service Manager in early 2007. The unrefuted evidence shows that





Carney, Salmond, and Donna Andrews, who had ultimately replaced Jerauld as Adult Services Manager in 2006, all perceived work performance issues with certain employees in the Reference Services Department, including Green, Fidelle, and Page Hendrix. For example, Andrews and Salmond noticed that these employees frequently took longer than their allotted time for their lunch breaks or failed to timely arrive to begin evening shifts, resulting in scheduling problems for other employees; made personal calls on their cellular telephones in public areas where Library patrons could overhear; and socialized in the office in view of patrons awaiting assistance at the Reference Desk. (See, e.g., Andrews Aff. ¶¶ 5-6, ECF No. 31-2 at 2; Salmond Aff. ¶¶ 8-9, ECF No.31-3 at 3; Carney Aff. ¶ 4, ECF No. 31-4 at 2.)

Green, for her part, perceived that Salmond assigned Green additional job duties, and felt that Salmond yelled at Green.[2] Green further believed that her supervisors tried to force Green to take leave pursuant to the Family Medical Leave Act ("FMLA") when Green actually had accrued sick leave and vacation time that could be used. During the course of a conversation with Carney and Shasta Brewer about her leave situation, Green apparently became upset and made a phone call in the Technology Center.[3] A patron later complained that Green was on the phone making a personal call and was being disruptive and unprofessional. Green received a written reprimand for violating Library policy regarding personal telephone calls.

---

[2] Salmond in turn describes Green's attitude and demeanor toward her as disrespectful, threatening, ominous, and insubordinate. (Salmond Aff. ¶¶ 10, 12, ECF No. 31-3 at 3, 4.)

[3] The record contains conflicting evidence about to whom this call was placed. Green contends that, at Carney's suggestion, she called her husband. (Pl.'s Mem. Opp'n Mot. Summ. J. at 5, ECF No. 38 at 5.) Other employees state that Green told them that she called her sister. (Brewer Aff. ¶ 12, ECF No. 39-1 at 2-3; .)





During the summer and fall of 2007, Green used approximately ten weeks of accrued sick leave and vacation time and was, consequently, present at work only sporadically. On November 1, 2007, Green informed Carney that Green was retiring effective November 4. Green was later provided with a copy of her annual performance evaluation, which evaluated her negatively. Her evaluation stated, for example, that Green worked with and communicated poorly with supervisors and co-workers, was inconsistently reliable in doing assigned work, and used minimal effort in completing assignments. (Performance Appraisal, ECF No. 31-7 at 24-29.) After her retirement, Green filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") on November 29, 2007.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported Motion for Summary Judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is





"genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B. Proof**

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, she may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (*en banc*). Such proof includes "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. (quoting Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995)). "[A] plaintiff must demonstrate that a 'protected trait . . . actually played a role in the employer's decisionmaking process and had a determinative influence





on the outcome.' " Worden v. SunTrust Banks, Inc., 549 F.3d 334, 342 n.7 (4th Cir. 2008) (quoting Hill, 354 F.3d at 286).

Alternatively, when direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, " 'the McDonnell Douglas frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*.' " Id.

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's



PJG

affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

**C. Temporal Scope of Green's Claims**

All of Green's claims are limited by Title VII's timeliness requirements. Where a plaintiff alleges discrete acts of discrimination or retaliation, she must file an administrative charge within the appropriate statutory period—in this case, 300 days from the occurrence of the discriminatory act. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 (2002); 42 U.S.C. § 2000e-5(e)(1). Thus, as to acts of racially disparate treatment or retaliation, only those alleged to have occurred within 300 days of Green's administrative charge are properly before the court.

By contrast, courts have recognized that, unlike discrete acts of discrimination, a hostile work environment may occur over an extended period of time. See, e.g., Morgan, 536 U.S. at 115. Thus, for hostile work environment claims, a plaintiff may recover if any act contributing to the hostile work environment occurred during the statutory period as long as all acts that constitute the claim are part of the same unlawful employment practice. Id. at 122.[4]

Here, Green's hostile work environment claim rests on her theory that Carney and Salmond continued Lyon's "racist agenda." (See Pl.'s Mem. Opp'n Mot. Summ. J. at 14-15, ECF No. 38 at 14-15; Green Dep. at 120, 136; ECF No. 31-6 at 30, 34.) However, the Library has presented unrefuted evidence that Carney and Salmond were utterly unaware of any such alleged agenda on the part of Lyon or anyone else at the Library, and that Lyon purposely did not discuss his opinion of any Library employees with Carney or Salmond. (Salmond Aff. ¶ 18, ECF No. 31-1 at 4; Carney Aff. ¶ 8, ECF No. 31-4 at 3; Lyon Aff. ¶ 11, ECF No. 31-5 at 3.) Green has no evidentiary support for her speculation that Carney and Salmond acted in continuation of any prior racially discriminatory behavior committed by Lyon. (See, e.g., Green Dep. at 74-84, ECF No. 31-6 at 20-21.) Based on this record, no reasonable jury could find that any of the allegedly discriminatory actions by Carney and Salmond committed within 300 days of the filing of Green's administrative charge were part of the same unlawful employment practice alleged to have occurred under Lyon.

All of Green's claims are therefore limited to alleged acts occurring on or before February 2, 2007, which, construing the evidence in the light most favorable to Green, is 300 days prior to the

[4] Morgan recognizes that with regard to discrete act claims, untimely discrete acts may, in appropriate circumstances, be considered as "background evidence." 536 U.S. at 113. The case makes clear, however, that in a hostile work environment claim a plaintiff may not recover for acts outside the 300-day window unless they are part of the same unlawful employment practice. Id. at 199, 120.





date Green signed her administrative charge. These acts appear to include: Carney's alleged attempt to force Green to take FMLA leave; Andrews's reprimand of Green for failing to follow Library policy regarding personal telephone calls; and Salmond's treatment of Green including alleged yelling and giving Green additional work duties.

**D. Green's Claims**

**1. Race Discrimination – Disparate Treatment**

To obtain relief based upon alleged discrimination under Title VII, a plaintiff must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)), petition for cert. filed, 79 U.S.L.W. 3480 (U.S. Feb. 8, 2011) (No. 10-1016). One of the ways a plaintiff can satisfy the fourth element is by showing that the plaintiff was replaced by someone outside his or her protected class. See Miles v. Dell, Inc., 429 F.3d 480, 486 (4th Cir. 2006); see also Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (*en banc*); St.Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

In a disparate treatment case, an adverse employment action is "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.' " Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)). It must constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly



PJG

different job responsibilities, or a decision causing a significant change in benefits. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

Most of the discrete acts alleged by Green within the applicable time period cannot be considered an adverse employment action under this standard. First, Green's allegation that her supervisors tried to force her to take FMLA leave rather than accrued paid leave cannot constitute such adverse action because the record is clear that Green did not actually ever take unpaid leave but rather was permitted to use her accrued paid leave. (Carney Reply Aff. ¶ 15, ECF No. 39-2 at 2); see Ellerth, 524 U.S. at 761; McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007) (concluding that "placing [the employee] on paid leave—whether administrative or sick—was not an adverse employment action"). Similarly, the assignment of additional work duties also cannot constitute adverse employment action in light of the fact that Green continued to work the same number of hours for the same pay. See Thorn v. Sebelius, C/A No. DKC 10-0299, 2011 WL 344127, *10 (D. Md. Feb. 1, 2011) ("Additional duties do not constitute 'adverse employment actions,' however, unless they are so weighty as effectively to change these basic terms of employment."); see also Haugerud v. Amery Sch. Dist., 259 F.3d 678, 691-92 (7th Cir. 2001) (affirming the finding that no adverse employment action occurred where male custodians were instructed not to help female custodians and the employer gave plaintiff additional responsibilities above those expected of male custodians, but plaintiff suffered no material harm), Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("[O]ther circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."). Moreover, the written reprimand for failing to comply with personal telephone call procedures is insufficient as a matter of law to

constitute the requisite adverse employment action. See, e.g., Prince-Garrison v. Md. Dep't of Health & Mental Hygiene, 317 Fed. Appx. 351, 353 (4th Cir. 2009) (stating that actions "such as . . . reprimands for insubordination . . . do not constitute adverse employment actions"); see also Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) ("Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them."); Lewis v. Forest Pharmaceuticals, Inc., 217 F. Supp. 2d 638, 648 (D. Md. 2002) ("Reprimands, whether oral or written, do not per se significantly affect the terms or conditions of employment.). Green's allegations regarding Salmond's treatment of her are similarly insufficient. See, e.g., Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997) (concluding that a manager's acts of yelling at plaintiff and telling other employees to ignore and to spy on plaintiff did not constitute adverse employment actions); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (stating that Title VII is not a "general civility code for the American workplace").

Were it supported by evidence, Green's allegation of constructive discharge could constitute an adverse employment action, but reliance on this event to establish a claim of disparate treatment fails because Green has no evidence to support an inference of discrimination. Rather, Linda Fidelle, a white employee who was perceived by management to have similar performance problems as Green, was terminated in the fall of 2007 shortly before Green retired. Moreover, while Green has presented some evidence of discriminatory animus on the part of David Lyon, all of the evidence shows that he had no involvement with Green's separation from employment. (Lyon Aff. ¶ 1, ECF No. 31-5 at 1; Carney Aff. ¶¶ 7-8, ECF No. 31-4 at 3.) Rather, the evidence unequivocally shows that Lyon, who hired Green, kept her on—despite his alleged "racist agenda"—for nearly twenty-





seven years, and that the allegedly hostile environment created by him was not so sufficiently abusive or pervasive as to cause a constructive discharge while he was Director. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996) (discussing the inference against discriminatory intent when the alleged discriminator is the individual who hired the plaintiff); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 291 (4th Cir. 2004) (*en banc*) (discussing the determination of who is a decision maker for purposes of liability under discrimination statutes); see also Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011) (USERRA) (holding that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA") (emphasis in original; footnotes omitted). Accordingly, Green cannot establish a *prima facie* case of discriminatory constructive discharge based upon her race.

**2. Retaliation**

Green's claim of unlawful retaliation for engaging in protected activity under Title VII also fails. Title VII's anti-retaliation section provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff in a retaliation case must show that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).





To satisfy the second element, a plaintiff must show that a reasonable employee would have found the challenged action "materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks & citations omitted).

Green argues that she engaged in protected activity by opposing unlawful discrimination because she "supported Denise Caldwell and Clara Gray when each was passed over for a promotion by Lyon." (Pl.'s Mem. Opp'n Mot. Summ. J. at 12, ECF No. 38 at 12.) The record shows that these events occurred in the 1980s. Any retaliatory conduct by Lyon based on Green's support of these individuals falls outside the 300-day limitations period. See Morgan, 536 U.S. at 122. Additionally, any actions by Carney or Salmond alleged to have been in retaliation for such activity are too far attenuated to raise an inference of retaliation, to the extent that Carney and Salmond even knew of Green's activity in this regard. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that to establish a causal connection based on temporal proximity alone, the time between the employer's knowledge of the protected activity and the adverse employment action must be "very close" and holding a twenty-month period to be insufficient); Yahenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006) (holding temporal proximity between protected activity and adverse action can provide *prima facie* showing of causality); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."); Pascual v. Lowe's Home Centers, Inc., 193 Fed. Appx. 229 (4th Cir. 2006) (unpublished) (*per curiam*) (holding that the plaintiff had failed



PJG

to establish a causal connection by temporal proximity alone when "at least three to four months" separated the claimed protected activities and the termination of the plaintiff's employment).

Slightly more to the point, Green also alleges that she engaged in protected activity in that she "reported actions taken against her, exercised her grievance rights against the Library and Lyon, and submitted rebuttals to pretextual reprimands." (Pl.'s Mem. Opp'n Mot. Summ. J. at 12, ECF No. 38 at 12.) Green fails to support these vague assertions with any facts showing that these activities were taken in opposition to unlawful discrimination. Even assuming they were, however, and even assuming that Green suffered materially adverse action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination, she has presented no evidence suggesting a causal connection between any of the events occurring within the 300 days before her administrative charge and these allegedly protected activities.[5]

**3. Hostile Work Environment**

Title VII prohibits creating or allowing a hostile work environment based on race, color, religion, sex, or national origin. See E.E.O.C. v. Xerxes Corp., __ F.3d __, 2011 WL 1549509, at *7 (4th Cir. Apr. 26, 2011); Baqir v. Principi, 434 F.3d 733, 746 n.14 (4th Cir. 2006). Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklife Sys., Inc., 510 U.S. 17, 21 (1993)

[5] The court observes that Green's argument on this point is conclusory and unspecific. (See Pl.'s Mem. Opp'n Mot. Summ. J. at 13, ECF No. 38 at 13) ("A causal connection between these acts exists. The wheels were set in motion by Green's support of her co-worker and her acts of defending herself from pretextual allegations. These retaliatory actions occurred for several years culminating with the negative performance review Green was given well after her retirement. The fact that Green felt she had no other option but to retire helps to demonstrate that retaliation occurred.").





(internal quotation marks & citations omitted). However, "[w]orkplaces are not always harmonious locales." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008). Moreover, as stated above, Title VII is not a "general civility code." Oncale, 523 U.S. at 80; Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 335 (4th Cir. 2010).

To make out a hostile work environment under Title VII, a plaintiff must show that (1) she experienced unwelcome harassment; (2) the harassment was because of her race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. See Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011). To meet the second element, a plaintiff must show that "but for" her race, she would not have been a victim of harassment. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic. See Graham v. Prince George's Cnty., 191 Fed. Appx. 202, 204 (4th Cir. 2006) (unpublished) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); see also Oncale, 523 U.S. at 80. When analyzing the third element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. See Harris, 510 U.S. at 23; see also Sunbelt Rentals, Inc., 521 F.3d at 315-16 (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents



PJG

that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

Left with the alleged acts that occurred during the applicable statutory time period, Green cannot establish a *prima facie* case of a racially hostile work environment. First, Green cannot show that any of these acts were based on her race. Cf. Mosby-Grant, 630 F.3d at 334 (finding the second element of the *prima facie* test satisfied where the record included "references of recruits to the historical lynching of African Americans . . . , and their use of derogatory terms like 'f[**]king Mexicans,' 'honky,' and 'ghetto' " demonstrating that there was a level of racial hostility). Moreover, none of the acts of which she complains, either taken alone or together, are sufficiently severe and pervasive to meet the standard for a hostile work environment. See, e.g., McNeal v. Montgomery County, Md., 307 Fed. Appx. 766, 776 (4th Cir. 2009) (unpublished) (stating that "five accusations of theft and [the supervisor's] requirement that [the plaintiff] bring in doctor's notes and provide for more detail about his sick leave hardly rise to the level of 'hostile or abusive' treatment"). Insistence on compliance with Library policies and requiring an employee to do her job does not rise to the requisite standard. Similarly, criticism and reprimands alone, even if perceived to be unjust, are insufficient. See Bonds, 629 F.3d at 385 (affirming the dismissal of a hostile work environment claim, finding the plaintiff's allegations "[fell] well short of alleging an abusive working environment" where the allegations "largely include[d] actions taken against her in response to concerns regarding her performance) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

**4. Pretext**

Finally, even if Green could establish a *prima facie* case for any of her Title VII claims, she has no evidence to show that the Library's proffered reasons for the perceived negative actions against Green were pretextual. Her argument that she has shown pretext because her final evaluation was presented after her unexpected retirement following extended periods of leave and was performed by staff who had supervised her for less than a year is unavailing, as these events do not tend to show that Salmond's and Carney's perception of Green's unsatisfactory work performance was not the true reason for their criticism and reprimands. This is especially so in light of the fact that a white employee was terminated for similar performance issues. See Reeves, 530 U.S. at 148 (stating that "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate); Merritt, 601 F.3d at 294-95 (stating that "the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination").

**RECOMMENDATION**

Green's Title VII claims fail as a matter of law. The court therefore recommends that the Library's motion for summary judgment (ECF No. 31) be granted in its entirety.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

May 6, 2011
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).